IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


UNITED STATES OF AMERICA,

v.                                                     CASE NO. 4:01-cr-00033-SPM-AK

MICHAEL LAMAR BROWN,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Defendant's motion to vacate pursuant to § 2255, Doc.

52, and supporting memorandum and affidavit.  Docs. 54 & 57.  The Government filed its

response, Doc. 61, and Defendant filed a reply.  Doc. 62.  Defendant subsequently filed a motion

to supplement, Doc. 68, which the Government opposed.  Doc. 69.  As the Court began its

review of this case, it came to the Court's attention that the Government never filed the affidavit

of counsel, as it indicated it would.  *See* Doc. 61 at 9.  The Court therefore allowed the

Government to correct this oversight by filing the affidavit of trial counsel.  Doc. 71 & 73.

Defendant filed an amended reply in support of his § 2255 motion, Doc. 75, and a supporting

counter-affidavit.  Doc. 76.  As the Court renewed its review, it became concerned about one

allegation in particular, namely, that counsel failed to assist or otherwise impeded Defendant in

his attempts to cooperate with the Government.  The Court therefore allowed the parties a

limited period to "submit any additional evidentiary materials either supporting or opposing" this

claim so that it could determine whether an evidentiary hearing would be necessary.  Doc. 77.  In

response, Defendant submitted the affidavit of his father and his own sworn statement.  Doc. 78.

The Government did not file any additional materials.  With the submission of these additional

materials, this  matter is now in a posture for decision.  After careful consideration, the Court

recommends that the motion to vacate be denied without evidentiary hearing.

## <u>BACKGROUND</u>

Defendant was indicted in this Court for manufacturing more than 100 marijuana plants.

Doc. 1.  He was represented by Anthony L. Bajoczky.  Doc. 13.  On August 17, 2001, the

Government filed an Information and Notice of Intent advising Defendant that it intended to seek

enhanced penalties based on Defendant's criminal history.  Doc. 14.  The Information and Notice

listed three prior felony drug convictions in 1995, 1996, and 1999.  *Id*.  With the enhanced

penalties, Defendant was subject to a term of ten years to life imprisonment, rather than five to

forty years imprisonment.  *Id*.

On August 28, 2001, Defendant appeared before the magistrate judge for a change of

plea.  Initially, the Court advised Defendant:

THE COURT:                    [T]his is very important for you and it's important
                              for the process and so therefore you could be
                              prosecuted for perjury if you don't tell me the truth
                              now, but it's in your interest to tell me the truth so I
                              can assure myself that you have been fairly treated
                              here.

                              If there's anything that I say to you that you can't
                              understand, let me try to explain it.  And Mr.
                              Bajoczky is here.  We can stop and  you'll have
                              plenty of time to talk to him.  I'll stop the whole
                              thing and we can start again on another day.  You
                              don't have to go through this without complete

advice of counsel and knowing what you're doing.
So we'll proceed.

You understand all of that?

THE DEFENDANT:  Yes, sir.

Doc. 37 at 3-4.  After reviewing the rights that Defendant was waiving by pleading guilty, the

Court asked:

THE COURT:  Do you understand that a plea of guilty admits the truth of the charges brought against you, but a plea of not guilty denies the charge?  Do you understand the difference between a guilty and a not guilty plea?

THE DEFENDANT:  Yes, sir.


*Id*. at 10.

The Court further advised Defendant as follows:

THE COURT:  If your plea of guilty is accepted by Judge Mickle, you waive, or give up, any defense you may have to the charge.  I'm not saying that you have a defense, but I'm saying that if you had one, any defense you've got, any arguable defense, would be given up by the guilty plea.  You understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you still wish to plead guilty?

THE DEFENDANT:  Yes, sir.

THE COURT:  If your plea of guilty is accepted by the court, you waive or give up your right to appeal the issue of your guilt or innocence and all issues concerning proof of the charges against you.  Do you understand that?

| | |
|---|---|
| THE DEFENDANT: | Yes, sir. |

*Id*. at 11.

The Court then queried Defendant about the Statement of Facts:

| | |
|---|---|
| THE COURT: | Have you had a chance to go over the statement of facts with Mr. Bajoczky? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | You state here that you've read the facts and agreed that the government can present that evidence as set out above, and that you understand you may present the court with your own version of the facts and my dispute particular allegations against you.  Is that your agreement to this statement of facts? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Can you tell me in your own words what you did that causes you to be guilty of this offense? |
| THE DEFENDANT: | Grew marijuana. |
| THE COURT: | Did you grow more than 100 plants? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | And did you know you were growing it? |
| THE DEFENDANT: | I didn't know that it would be more than 100 plants, but I knew I was growing it. |
| THE COURT: | You knew you were growing marijuana and you now know that there was more than 100 plants? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | And were all of those plants, over the 100 amount, yours? |
| THE DEFENDANT: | Yes, sir. |

* * *

| | |
|---|---|
| THE COURT: | Is there anything in the statement of facts that you currently disagree with? |
| THE DEFENDANT: | No, sir. |
| THE COURT: | All right. |
| MR. BAJOCZKY: | I'm not aware of anything, Your Honor. |

*Id*. at 13-14.  The Court then filed the Statement of Facts, which states, in pertinent part:

1.   On June 28, 2001, Officers of the Florida Fish and Wildlife Conservation Commission spotted a black Dodge truck in...a restricted area....The driver, Marjorie Sewell, stated that she was looking for a lost dog....

2.   The officers then began searching the nearby woods.  Within about fifty yards of the location where the Dodge truck was first seen, they found 367 marijuana plants....After harvesting this marijuana, the officers noticed that Sewell was loitering in the area....

3.   The Wildlife officers took their seizure to the Gadsden County Sheriff's Office.  Law enforcement realized that the Dodge truck is owned by Brady Brown and that it is often driven by his son, Michael Lamar Brown, a well-known marijuana grower with at least three prior felony marijuana convictions.  Officers...went to...Michael Brown's home....At the home, they found Brown, Sewell, and the Dodge truck.

4.   Officers first interviewed Sewell....She repeated the story about the lost dog.

5.   Officers then advised Brown that they were not satisfied that Sewell was telling the truth.  Brown, who was not in custody, then stated that he did not want his girlfriend to get in trouble for the marijuana plants that he had planted.  Brown said that he was "topping" the marijuana plants when the officers found his girlfriend and that he fled the area on foot.  Brown said that after Sewell picked him up, he hid the marijuana cuttings in a camouflage shirt....

6.   Still not in custody, Brown offered to take the officers back to the marijuana patch and to retrieve the marijuana cuttings.  On the way to the patch, Brown stated that he had grown marijuana for fifteen years and that

he was one of the best marijuana growers in Liberty County. He said that he had planted and fertilized this crop and that today had been the first visit back since planting. Brown directed the officers to the cultivation site, a remote location which a person would be unlikely to find from directions alone....Brown directed the officers to a roadside location where a camouflage shirt containing a number of marijuana cuttings was found.

7.      In the following weeks, officers found a second marijuana patch of 167 plants within a short distance across a road from the first patch. These plants were of similar size and appearance, and appeared to be cultivated in the same fashion as the first patch....

8.      [O]fficers arrested Brown and executed search warrants at his residence and on the Dodge truck. From the residence, officers seized issues of High Times magazine....Officers also seized handwritten notations which appear to relate to the cultivation of marijuana. Following directions in these notations, officers have found several additional marijuana patches and seized approximately 70 more marijuana plants.

9.      Following arrest and advice of <u>Miranda</u> rights Brown again confirmed that he was a marijuana grower, including stating that the government had arrested his best customer in Kenneth Daniels and that he used to trade Daniels marijuana for crack cocaine....

10.     Defendant was convicted in Gadsden County, Florida of cultivation of marijuana, on January 20, 1999. On December 11, 1996, Brown was convicted of possession of more than 20 grams of marijuana, in Levy County, Florida. On November 30, 1995, Brown was convicted of possession of more than 20 grams of marijuana, in Liberty County, Florida.

Doc. 19.

The Court continued its colloquy, questioning Defendant's understanding of the

penalties:

THE COURT:              The maximum sentence that might be imposed is determined by the government's notice of enhancement, and in the statement of facts, you agree that the government could prove that the prior drug felonies that are noticed in the notice of enhancement are true. Is that correct?

THE DEFENDANT:      Yes, sir.

THE COURT:      Then the maximum potential penalty...is a sentence of life imprisonment with a minimum of ten years of imprisonment....

* * *

THE COURT:      [H]aving recited to you the maximum sentences that are allowed under the statute, are you aware that that's what the court is allowed to impose under the statute based upon your plea of guilty?

THE DEFENDANT:      Yes, sir.

THE COURT:      Has Mr. Bajoczky explained to you that supervised release is like a term of probation that you must serve after your release from prison?

THE DEFENDANT:      Yes, sir.

* * *

THE COURT:      Have you and Mr. Bajoczky talked about how the sentencing commission guidelines might apply to your case?

THE DEFENDANT:      Yes, sir.

THE COURT:      Do you understand that Judge Mickle will not be able to determine the guidelines sentence for your case until after the presentence report has been completed and you and the government have had an opportunity to challenge the facts reported by the probation officer?

THE DEFENDANT:      Yes, sir.

THE COURT:      Let me put it another way; that I'm sure you've tried to do some prediction about the guidelines sentence.  Have you tried to do some prediction about that?

THE DEFENDANT: No, sir.

THE COURT: You haven't even done that?  Okay.

MR. BAJOCZKY: I have looked at it...and I've gone over what his range is, what I believe under the guidelines, but again, I've explained to him it depends on exactly what the PSI finds.

THE COURT: All right, that's the point I'm trying to make, is once this report is done, it still won't be final until Judge Mickle has ruled upon any objections that may exist.  So no one can tell what the guideline range is until that final determination is made.

HE DEFENDANT: Yes, sir.

THE COURT: You understand that Judge Mickle will have some limited authority to impose a sentence either more severe or less severe than what the guideline range may recommend?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also understand that the mandatory minimum ten-year term that's in the sentence is a floor, and that is if the guideline range is lower than that, then Judge Mickle will have to impose at least a ten-year sentence no matter what the guideline range says?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that parole has been abolished and that whatever prison sentence...is imposed, that you'll have to serve almost all of the prison sentence with no chance of getting out on parole?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand if the sentence by Judge Mickle is more severe than you expect, you'll still be bound by your plea, and you'll have no right to withdraw?

| | |
|---|---|
| THE DEFENDANT: | Yes, sir. |

*Id*. at 15-18.

The Court then queried Defendant regarding the Plea Agreement:

| | |
|---|---|
| THE COURT: | I understand there's a plea agreement, is that correct? |
| MR. BAJOCZKY: | It is. |
| THE COURT: | And it's not a cooperation agreement, is it? |
| MR. SIMPSON: | No, sir....It's what we refer to as a straight-up plea agreement.  There has been some discussions that there may be some possibility of cooperation down the line, but if that happens we'll deal with it when the matter occurs. |

* * *

| | |
|---|---|
| THE COURT: | Mr. Brown, what's your understanding about...what you'll get from the plea agreement? |
| THE DEFENDANT: | Whatever Judge Mickle gives me. |
| THE COURT: | So in other words you're entering a guilty plea and you're facing sentencing by Judge Mickle according to the sentencing guidelines? |
| THE DEFENDANT: | Yes, sir. |

* * *

| | |
|---|---|
| THE COURT: | So do you understand that based upon your guilty plea that at least the ten-year sentence will be imposed? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Has Mr. Bajoczky gone over this plea agreement with you to your satisfaction? |

THE DEFENDANT:        Yes, sir.

THE COURT:            Is there anything you want to ask him now...that you don't understand?

THE DEFENDANT:        No, sir.

THE COURT:            Do you fully understand the terms of the plea agreement?

THE DEFENDANT:        Yes, sir.

* * *

THE COURT:            Do you understand about the procedure for cooperation?

THE DEFENDANT:        Yes, sir.

THE COURT:            This is not a part of the plea agreement, but I want to go over it with you so I feel like you understand about that and know what...all that means.

Do you understand that prior to sentencing if you were to provide truthful information that resulted in substantial assistance to the government in the apprehension and conviction or prosecution of somebody else, and–that's the first part of it.  You understand all about that?

THE DEFENDANT:        Yes, sir.

THE COURT:            And do you understand that the government in its sole discretion decides that that was substantial assistance; it's nothing that Judge Mickle has any control over?

THE DEFENDANT:        Yes, sir.

THE COURT:            But if they decide it's substantial assistance, they have the authority to file what is called a 5K1.1 motion, or the substantial assistance motion.

THE DEFENDANT:      Yes, sir.

THE COURT:      Do you understand?

THE DEFENDANT:      Yes, sir.

THE COURT:      Do you understand if they do that, then Judge Mickle is allowed to sentence you below the statutory minimum of ten years, and he's also allowed to sentence you below the guideline minimum?

THE DEFENDANT:      Yes, sir.

* * *

THE COURT:      Secondly, it this doesn't happen before sentencing, you understand that if the same thing happens within one year of sentencing, the government has the authority to file what's known as a Rule 35 motion?

THE DEFENDANT:      Yes, sir.

THE COURT:      You understand?  And do you understand if they do, then Judge Mickle has the opportunity to revisit the sentence and do exactly the same thing, that is lower the sentence in some way, and could lower it below the ten-year minimum mandatory of the statute or...whatever minimum floor of the guidelines.  You understand?

THE DEFENDANT:      Yes, sir.

THE COURT:      Again, the most important part of this is, do you understand that all of this has to happen either before sentencing or within one year?

THE DEFENDANT:      Yes, sir.

MR. SIMPSON:      [I]f I may add a caveat to that.  Because this is not a cooperation agreement, on the one hand, Mr. Brown is not required to cooperate.  On the other hand, if

he does cooperate, the government is not required to recognize it. That's the difference between a plea and cooperation agreement and a straight-up plea agreement. Now if Mr. Brown wants to cooperate, we'll talk about it and proceed.

THE COURT: That is a valid point. And I don't want to mislead you there. Because of the nature of this, there is not a contractual agreement that the government consider the filing of the substantial assistance motion. So it's totally up to the government.

MR. BAJOCZKY: Judge, make sure that I understand it and I explain it to him accurately. If you sign a plea and cooperation agreement...it's still totally up to the government whether they think you've cooperated. If you don't sign it, they're not obligated to file one, but if you have a plea and cooperation agreement they're not obligated to file one anyway.

THE COURT: Mr. Bajoczky's advice to you is accurate and correct. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: I think the government's point is they have not made a promise in writing to you, but Mr. Bajoczky's point is, as promises go, it's still their sole discretion.

MR.BAJOCZKY: They promise to think about it and maybe file it or not file it, and if you don't give them the promise to think about it and file it or not file it, then they can still file it or not file it if they want to.

THE COURT: Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: That's the hard facts of both types of agreements.

Knowing all that, do you still wish to adhere to this plea agreement that you've

submitted?

THE DEFENDANT:         Yes, sir.

*Id*. at 18-23.  The Plea Agreement was then filed.  Doc. 20.  The Agreement contains the

following language:

> Defendant is pleading guilty because [he] is in fact guilty of the charge in the
> Indictment.  In pleading guilty to this offense, defendant acknowledges that were
> this case to go to trial, the government could present evidence to support this
> charge beyond a reasonable doubt.  Defendant also affirms, pursuant to 21 U.S.C.
> § 851(b), that he has been convicted of the offenses set out in the government's
> Information and Notice of Intent (to pursue enhanced sentences).

*Id*.

The Court next questioned Defendant regarding the voluntariness of his change of plea

and the effectiveness of his counsel:

THE COURT:            Has anyone made any promises to you as to the
                      sentence that might be imposed that is not in that
                      plea agreement?

THE DEFENDANT:        No, sir.

THE COURT:            Has anybody made any secret predictions with you
                      that you're counting on that are short of a promise?

THE DEFENDANT:        No, sir.

THE COURT:            Has anyone threatened you or forced you to sign
                      this plea agreement overbearing your will to do it?

THE DEFENDANT:        No, sir.

THE COURT:            Is this a voluntary agreement on your part that you
                      want to enter a plea of guilty?

THE DEFENDANT:        Yes, sir.

THE COURT:            You're represented by Mr. Bajoczky here, and he's

obviously here and had a number of things to say as
we've gone over this.

Have you had sufficient time to discuss your case
fully with Mr. Bajoczky?

THE DEFENDANT:            Yes, sir.

THE COURT:               Have you in fact done that?

THE DEFENDANT:            Yes, sir.

THE COURT:               Do you need anymore time today to do that before I
                         conclude these proceedings?

THE DEFENDANT:            No, sir.

THE COURT:               Are you satisfied with the way he and his office has
                         represented you?

THE DEFENDANT:            Yes, sir.

THE COURT:               Do you have any complaint against him or his
                         office?

THE DEFENDANT:            No, sir.

*Id.* at 23-24.

Defendant then pled guilty, and the Court explained the Presentence Report to him:

THE COURT:               There will be a presentence report and you will
                         have a copy of it at least 35 days before
                         sentencing–is that right, Randy Amos?  Does he get
                         the report 35 days before sentencing?

PROBATION OFFICER:       His attorney will get that report and it's up to the
                         attorney to review it with the defendant.

MR. BAJOCZKY:            We get it.

THE COURT:               The procedure for doing this is that you're going to
                         get interviewed and you have a right to have Mr.
                         Bajoczky there at the interview.  Anything you want

|  | in that report that Judge Mickle needs to hear about, you can tell the pretrial services officer, and it's your duty to do it. |
|---|---|
|  | If you have any potential criminal liability for anything other than this case, you have a Fifth Amendment right to remain silent.  You don't have to incriminate yourself as to anything else.  However, anything that you want Judge Mickle to know about, you must tell Judge Mickle in this interview. |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | And that's why you've got a right to have counsel present, to help you with your answers.  You'll have a right to object to the presentence report and to have a hearing before Judge Mickle at the sentencing. |

*Id*. at 25-26.

The magistrate judge subsequently recommended that the guilty plea be accepted.  Doc. 22.  The Court adopted the R&R and accepted the guilty plea.  Doc. 25.

On October 3, 2001, the probation officer mailed Defendant's counsel two copies of the PSR with a reminder that "[o]ne copy of this report is for you and one copy is for your client."  Doc. 26.  The officer advised counsel that the "report should be discussed with your client prior to imposition of sentence" and set the deadline for written objections.  *Id*.  According to the Supplemental Addendum to the PSR, counsel submitted one objection directed to Paragraph 14, "Drug Weight."

On November 13, 2001, Defendant appeared with counsel for sentencing.  Initially, the Court, after adjudging Defendant guilty, permitted Defendant and his counsel an opportunity to address the Court.  Doc. 42 at 3-4.  The following exchange occurred:

MR. BAJOCZKY:          Well, Your Honor, I...will note that at one time I had submitted a letter of October 17 to [the probation officer] that challenged the number of marijuana plants involved.  There were marijuana plants found on two or three different occasions that were attributed to [Defendant].

However, I also in that letter point out that unless there were a 5K1 recommendation for reduction of sentence, that [Defendant] is bound by the minimum...mandatory because of his prior felony convictions.

So my letter still stands that he had an objection to the 604 plants as being claimed all of his. However, at this time, I think the...mandatory minimum sentence overrides that, and somewhat makes that moot....

I would also point out that...there is case law that this Court, in spite of the Congressional mandate for minimum mandatory sentence, does have authority for a downward departure in...this sentencing.

[Defendant's] sentence in this case, were it not for the minimum mandatory, would be 46 to 57 months.  That would be less than half of the sentence that Congress has dictated under their career criminal.

[Defendant] has always been local, he's always been involved, Your Honor, not with anything other than the marijuana.  He does have some prior convictions.  But I will point out that at no time, did he ever receive any prison sentence.

He has no other convictions that I know of, other than the marijuana or the marijuana related convictions.  I think one conviction...was resisting or obstructing a probation officer when they were trying to give him a urinalysis test for marijuana.

Other than that...I would just ask the Court to, if

|                      | possible, to depart, go below the guidelines, and sentence him to a guideline sentence recommended for the number of marijuana plants that they have alleged, as opposed to the minimum mandatory of ten years. |
|----------------------|---|
|                      | Is there anything you want to tell the judge? |
| THE DEFENDANT:       | No, sir. |
| THE COURT:           | All right, Mr. Brown, is there anything you'd like to say? |
| THE DEFENDANT:       | No, Your Honor. |

*Id*. 4-5.

The Court found that the objection was moot, since "[e]ven if sustained, the defendant's sentence would remain at 120 months due to his prior felony drug convictions."  *Id*. at 6.  It then sentenced Defendant to the mandatory minimum sentence of 120 months imprisonment.  *Id*. at 6-7; *see also* Doc. 29.

Defendant immediately appealed his sentence with different counsel.  Doc. 30.  The Eleventh Circuit affirmed, finding that *Apprendhi* does not apply to prior convictions.  Doc. 51.

The instant motion to vacate ensued.  On this occasion, Defendant raises two grounds for relief.  In the first, he "maintains that his due process rights under 21 U.S.C. § 851(b) were patently ignored.  Further, his rights under Rule 32 of the Federal Rules of [Criminal] Procedure were glossed over as the Petitioner never received a copy of his presentence report nor reviewed it with counsel."  Doc. 52.

In the second ground for relief, Defendant claims that his counsel was ineffective (1) by failing to prepare and investigate, (2) by misinforming Defendant "as to the substance of the law

(including failing to review the presentence investigation report with [Defendant]," and (3) by

having a conflict of interest.  *Id.*  In Defendant's view, counsel's actions prevented him from

"knowingly and voluntarily waiving his right to a fair and impartial trial."  *Id.*

In support of these allegations, Defendant has submitted his sworn verification.

In that document, he states:

> The first time I spoke with my attorney was after my arrest....I instructed him that
> I wanted a motion to suppress filed to exclude exculpatory comments made by me
> in a custodial setting without...receiving any Miranda warnings.  My attorney
> refused, and began to yell at me, blaming my...situation on my wife.

> My attorney...explicitly told me that I could not call him nor write him directly.  I
> was told not to contact his office and if, in an emergency, I needed his assistance,
> I was told to ask my father to contact him.

> Mr. Bajoczky limited his meetings with me to two brief sessions.  At those
> meetings, he refused to talk to me, communicating in brief silent lip movements
> or writing short matters on paper....
> I requested at one point in time for my attorney to set up a meeting with Jim
> Corders of the Gadsden County Sheriff's Office....Mr. Corders had given me the
> impression that if I cooperated with his office, the charges against me would go
> away.  He took all of the information I gave him and turned it over [to] the
> Federal authorities.  Though I wanted to speak to Mr. Corders, Mr. Majoczky
> blocked any conversations.  Even though I later found out that Mr. Corders did
> want to meet again with me, my attorney refused to have me cooperate with the
> local authorities.

> At several times, my attorney blocked the free-flow of information between the
> U.S. Attorney's Office and me concerning any plea agreement.  When the
> Government first proposed that I plead guilty, my attorney refused to have me
> sign any agreement with the government, telling me that if I signed a plea, "the
> first thing the Government will do is arrest your dad and wife.  The Feds will
> pump you for all the information they could get...then arrest all of your friends,
> and then not give you credit for any of it!  You can't trust them."

> My attorney repeatedly told me that I could not trust the Government and
> therefore should not tell them everything I knew.  As I wanted to cooperate as
> much as possible in the acceptance of responsibility and to minimize my sentence,
> this advice was confusing at best, perhaps illegal, and at worst unprofessional.

Despite all my requests of my attorney, he failed to investigate my case.  He failed to negotiate with the Government concerning my plea, and consequently allowed enhancements to be imposed.  I was informed by Federal Public Defender Bill Clark that the Government was willing to agree to the minimum five year sentence (without enhancements), but my counsel never asked for the 851 Information to be removed.  All my attorney wanted was for me to plead guilty as quickly as possible and as quietly as possible.

Soon after the plea issue was raised, I told my attorney that I could draw a map locating 165-marijuana plots.  He informed me that the government wanted to know the location of the plots and information on my partner.  In early September 2001, I drew such maps.  It took me more than three days to complete, and...my father delivered them to Mr. Bajoczky.  He never delivered them to the Government.  I only found out that he never transmitted this important information to the Government when I received a letter from the Assistant U.S. Attorney threatening me with obstruction of justice if I did not cooperate.  When I asked Mr. Bajoczky why he did not turn the material over to the Government, he told me that he was just "making the prosecution's mouth water."

When the Government did want to meet and interview me...Mr. Bajoczky refused to join me.  He said he did not have time, but that I needed the interview to get a [downward] departure.  In addition, though, he counseled me not to divulge everything on everyone.  He never elaborated.

I met with DEA agent Erin Desmond and FDLE agent Jim Broadway on the last day or so of October 2001.  When I inquired of the agents how many plants they found from my maps, they were confused.  Mr. Bajoczky had not delivered them any of the location information.  They immediately went to his law office to obtain the information and begin to track down the sites.  However, by the time they go to the various sites, my partner had been tipped off and removed all of the plants and hundreds of pounds of marijuana.

I know about how my partner had been tipped off because my partner was my girlfriend–now wife.  She has been with me every step of the way.  I have been willing to testify against her if it would assist my case, but my attorney would have none of that.  As much as I wanted to come clean and not protect people, my attorney wanted just the opposite and stopped me from benefitting from any such cooperation.

* * *

My attorney did not file any sentencing memorandum or other request for

departure, though I repeatedly asked him to.  Further, I was not shown a copy of my presentence investigation report and my attorney did not discuss its contents at all.  The sentencing judge did not even ask me if I had seen the report nor discussed it with anyone!

The day after my sentencing, my father went to Mr. Bajoczky's office to retrieve my file.  Mr. Bajoczky questioned my father as to what my plans were and how much additional testimony was I going to give the Government.  He and his other clients and friends then began a campaign of telling me that I could not tell the Government what I knew.

Doc. 57.

In response, the Government submitted the affidavit of counsel:

Early in the federal prosecution of [Defendant's] case, the Assistant U.S. Attorney informed me that because of [Defendant's] past extensive criminal history...[he] would be required to provide greater assistance to the government than ordinary defendants in order for his cooperation to be considered "substantial assistance." The Prosecutor further made it quite clear that any assistance provided by [Defendant] regarding other persons involved in the cultivation/manufacturing of marijuana would not be considered or qualify as "substantial assistance" for a reduction of sentence.  This entire matter was fully discussed between me and [Defendant] again and again.

I received discovery from the government, including information about the seizure of a marijuana patch that [Defendant] admitted growing, information about the Search Warrant executed as this home, and information about statements/admissions of [Defendant] made after his arrest.

I spoke with [Defendant] in detail about the case and the evidence against him. [Defendant] was unable to provide me any information or leads that might have led to a suppression of the evidence against him or a valid defense in this case.

In hopes that [Defendant] could qualify for a substantial assistance Motion, I encouraged [Defendant] to give full and truthful information about all persons he knew that were involved in criminal activity.  I did not tell or suggest to [Defendant] that he should withhold information about any person(s), but the contrary specifically instructed/advised [him] to fully cooperate and be truthful with the Government.

I am not aware of any person(s) that he could have provided information about whom I represented.

Prior to sentencing, I reviewed the Pre-Sentence Report with [Defendant]. [He] received the ten year mandatory minimum sentence that was required because he was involved with more than 100 marijuana plants, and had been convicted of one or more felony drug offenses in the past.  I was not then and am not now aware of any basis to contest either of these facts.

Doc. 73.

In a counter-affidavit, Defendant states:

If I had to give greater assistance, I was never told this.  Bajoczky told me if I did not sign the letter of cooperation my father, girlfriend (who later became my wife) and all my friends would go to jail and I would get no break in my sentence.

Bajoczky wanted me to draw detailed maps showing the exact location of 165 plots of marijuana.  He withheld the maps for months then when Bajoczky finally did turn over the maps to the DEA I was told all the marijuana had been harvested.  Mr. Simpson sent me a letter saying I withheld information and allowed my partner to harvest hundreds of pounds of marijuana, when in fact Bajoczky withheld the maps from late August to early November 2001.  When I was told by the DEA they had not received the maps, my father called Bajoczky and asked him why he had not turned over the maps and Bajoczky said he was making "their mouths water" for the maps.  I offered my partner to Mr. Simpson since this but he refuses to accept it.  I am still willing to give my cultivation partner and my distribution man....

Bajoczky said he discussed this matter with me again and again.  He only visited me twice while I was incarcerated, once when I was initially arrested, a week later, and he visited me once more after I pled guilty.  Only once during the second visit did he even speak of cooperation.  I was only told of a co-operation motion the day I pled guilty, Bajoczky never mentioned it ot me prior to that day in court.

I asked Bajoczky to file a suppression motion.  He refused....

* * *

Bajoczky told me I could give information on people and I would get credit for the information I gave out, but I couldn't tell on everyone.  He said I would receive credit for what I gave the government and I would get credit for all the information, but one at a time.  I feel if I would have given information on people Bajoczky represents or has represented, he would tell them I had informed on them and my family would be in danger....

Bajoczky only visited me once after I plead guilty.  I never saw my PSI.  I didn't even know I was supposed to see it until I got to prison.

One hundred and Sixty five plots of marijuana disappeared.  Only my wife, and Bajoczky knew the location, there is no way thieves could have stumbled up on that many plots spread out over two counties.  I read a letter from Jim Corders, investigator from Gadsden County, FL, that was sent to Bajoczky...before I was sentenced, where he asked to talk to me.  I was never informed of this letter.  I found it in my files.   Also the prosecutor sent a letter to me and said if I had spoken with the DEA it would be beneficial to my sentencing and if I didn't, I would be prosecuted for obstruction of justice.  I asked Bajoczky to be present at this meeting and he refused.  He said he didn't have time.

Doc. 76.

## DISCUSSION

I.      Violation of due process.

As previously noted, Defendant complains that the Court violated his right to due process by failing to follow the procedures for establishing prior convictions pursuant to 21 U.S.C. § 851.  More specifically, Defendant argues that the Court was required, "after conviction but before pronouncement of sentence," to inquire "whether [Defendant] affirms or denies that he has been previously convicted as alleged" and to "inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." 21 U.S.C. § 851(b).

Although this appears to be an issue which should have been raised on direct appeal, the claim is easily disposed of.  Only one prior felony drug conviction was necessary for an enhanced sentence in Defendant's case.  According to the PSR, on August 25, 1994, Defendant pled no contest to possession of more than 20 grams of marijuana.  Adjudication of guilt was withheld, and he was sentenced to 18 months probation.  On November 30, 1995, Defendant's

probation was revoked and he was sentenced to 6 months incarceration.  This conviction was not

challengeable under § 851(e) because the statute of limitations had expired for asserting a

challenge to a prior conviction.  The date of the Information and Notice was August 17, 2001,

more than five years after the conviction was final; thus, pursuant to *United States v. Weaver*,

905 F.2d 1466, 1482 (11th Cir. 1990), the Court was "not required 'to adhere to the rituals of §

851(b) where a defendant, as a matter of law, is precluded from attacking the conviction forming

the basis of the enhancement information.'"

Furthermore, although Defendant was not afforded the opportunity to question the

validity of the prior convictions at the sentencing hearing, he was afforded that opportunity both

before he appeared for the change of plea hearing, *see* 21 U.S.C. § 851(c), before he signed the

Plea Agreement and the Statement of Facts, and before he pled guilty.  The magistrate judge

questioned Defendant on the issue of his prior convictions, and he never even intimated that he

disputed the validity of any of the convictions.  As previously noted, only one prior felony drug

conviction was needed to invoke the enhanced sentencing provisions of § 851, and as a matter of

law, Defendant could not contest the 1995 conviction.  Defendant was sentenced to the minimum

mandatory sentence, and it is therefore of no consequence that counsel did not object when the

Court "bypassed" this issue at sentencing.

The Court turns next to Defendant's claim that the Court violated his due process rights

when it failed to "verify that the defendant and the defendant's attorney have read and discussed

the presentence report."  Fed. R. Crim. P. 32(i)(1)(a).  Although this also appears to be an issue

which should have been raised on direct appeal, the Court will address it nevertheless.  The

Eleventh Circuit has held that it "does not see that Rule 32 requires a sentencing court to pose

specific questions (whether defendant and counsel have read the report, whether they have discussed it, whether there are any mistakes)...."  *United States v. Aleman*, 832 F.2d 142, 144 n.6 (11th Cir. 1987).  This is the majority rule.  *See United States v. Victoria*, 877 F.2d 338, 340, 340 n.7 (5th Cir. 1987) (joining the "more logical majority rule" that court may draw inferences from court documents and defendant's and counsel's statements when determining whether defendant had opportunity to read and discuss presentence report with counsel).  While "such precise questioning is useful to assure that the sentencing court complies with the dictates of the rule and to assure that such compliance is clearly evidenced in the record," *Aleman*, 832 F.2d at 144 n.6, the sentencing judge in the instant case had no reason to believe that counsel had not fulfilled his duty to review the PSR with his client.  Defendant was plainly advised at the plea colloquy that his attorney would be given a copy of the PSR and that it was his attorney's duty to review the PSR with him.  Counsel filed objections to the PSR and addressed the Court regarding those objections at sentencing.  When the Court addressed Defendant directly, he advised the Court that he had nothing to say.  In short, while the record would be more clear on this issue if the Court had directly asked Defendant whether he had reviewed the PSR with counsel, the Court was in no manner alerted to any possibility that Defendant had not read the PSR.

Assuming arguendo that counsel did not review the PSR with Defendant, no prejudice flowed from this failure.  *See United States v. Martinez*, No. 04-2298, 2006 WL 137406m at *4-5 (10th Cir. Jan. 19, 2006) (resentencing required for Rule 32 violation only if defendant suffered prejudice).  As previously discussed, Defendant received the mandatory minimum ten-year sentence because he had a prior felony drug conviction that was established as a matter of law and to which he acknowledged and agreed–both verbally and in writing--during the change of

plea proceeding. His argument that "[w]ithout the advance understanding of the enhancements evidenced in the [PSR], the [Defendant] was truly and literally blind-sided at sentencing," Doc. 54 at 8, is patently without merit and refuted by the record.

II.      Ineffective assistance of counsel.

As previously noted, Defendant claims that his counsel was ineffective in a number of ways. Each will be considered in turn, but the Court begins with a review of the applicable standards for considering claims of ineffective assistance of counsel.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Strickland*, 466 U.S. at 697. The Court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The Court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*,

257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not

sufficient to disprove the strong and continuing presumption...that [counsel] did what he should

have done and that he exercised reasonable professional judgment."  *Chandler v. United States*,

218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).

To show prejudice, a defendant must show more than simply that counsel's unreasonable

conduct might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*,

466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A

"reasonable probability is defined as a probability sufficient to undermine confidence in the

outcome."  *Id*.  Additionally, prejudice is established only with a showing that the result of the

proceeding was fundamentally unfair or unreliable.  *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions

set forth above, the cases in which a defendant can properly prevail on an ineffective assistance

of counsel claim "are few and far between."  *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is

because the test is not what the best lawyers would have done or even what most good lawyers

would have done, but rather whether a reasonable lawyer could have acted in the circumstances

as defense counsel acted.  *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert.*

*denied*, 534 U.S. 903 (2001).  "The purpose of ineffectiveness review is not to grade counsel's

performance."  *Chandler*, 218 F.3d at 1313.  "[O]missions are inevitable.  But, the issue is not

what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'"

*Id*. (citation omitted).

The Court now turns to the individual charges of ineffectiveness.

1.      Failure to investigate and prepare.

In this ground for relief, Defendant argues that "counsel failed to engage in a reasonable and customary review of the case," including failing "to follow through with any pretrial investigation" and failing "to investigate matters raised by [Defendant]." Doc. 54 at 16.   More specifically, Defendant claims that counsel (1) "failed to investigate the bases for the plea offer," (2) "failed to determine the veracity of statements made by Sheriff Corders," (3) "failed to follow through with the assistance [Defendant] sought to provide to the United States," (4) "failed to seek a removal of the Section 851 Information," (5) "failed to object to the court's deficiency at sentencing regarding the Section 851 enhancements," and (6) "failed to discuss the presentence investigation report with [Defendant] in order to develop or determine any inaccuracies." *Id*.

The Court is not certain that it understands the claim that counsel "failed to investigate the bases for the plea offer," and there is nothing in Defendant's affidavits to shed light on this claim. At the change of plea hearing, Defendant, while under oath, told the Court that he was pleading guilty to the charge of cultivating more than 100 marijuana plants because he was in fact guilty of cultivating more than 100 marijuana plants.  He plainly agreed to the Statement of Facts, which clearly evidenced his cooperation with authorities both before and after his arrest.  Counsel had no duty to file a motion to suppress the statements Defendant made to law enforcement if there was no basis for the motion.  Defendant agreed that he was not under arrest at the time he made those statements, and thus, a motion to suppress would have been patently meritless. Furthermore, there is nothing in the record regarding any statements made by Sheriff Corders, except a newspaper article which essentially tracks the matters to which Defendant agreed in the Statement of Facts.   Otherwise, the Court has no notion of what statements Sheriff Corders

allegedly made which required investigation and which would have affected the outcome of the proceedings.  It is not enough simply to claim that counsel failed to investigate the charges against his client, for even if the Court assumes that instant counsel failed to investigate "the bases for the plea offer" and the "veracity of statements made by Sheriff Corders," Defendant must establish prejudice from these alleged errors.  Defendant has wholly failed in that regard on these two claims.

As to Defendant's claims that counsel should have challenged the § 851 Information and the Court's failure to follow the § 851 procedures, they are without merit.  As previously discussed, only one prior felony drug conviction was needed to support an enhanced sentence. Defendant's oldest felony drug conviction was not challengeable as a matter of law.  Thus, even if counsel had lodged objections to the other convictions, he could not challenge the 1994/1995 conviction pursuant to § 851(e), and Defendant was subject to the mandatory minimum 10-year sentence regardless of anything counsel might have done regarding the other prior convictions. Furthermore, even if the Court assumes counsel's failure to object to the procedures at sentencing was deficient performance, Defendant was not prejudiced thereby.  If the Court had directly asked Defendant whether he had reviewed the PSR and he had answered in the negative, the Court would simply have taken a recess or continued the proceeding.  As noted *supra*, the only objection Defendant has articulated  with regard to the contents of the PSR dealt with his prior convictions.  However, without a substantial assistance motion from the Government, the Court was constrained by the drug statute and the enhancement statute to sentence him to at least ten years imprisonment.  The Court sentenced Defendant to the minimum mandatory sentence, and objecting to the Court's procedure would not have changed that outcome.

This analysis applies equally to Defendant's claim that counsel improperly failed to review the PSR with him.  Certainly, counsel had a duty to provide the PSR to Defendant and to review it with him, and failing to fulfill that duty would amount to deficient performance.  However, even if counsel did fail in this duty, Defendant was not prejudiced thereby.  The record clearly shows that the magistrate judge thoroughly explored Defendant's understanding of the impact his admitted criminal record would have on his sentence and explained to him the constraints that the Court faced in imposing the mandatory minimum ten-year sentence.  Since the only objection Defendant asserts deals with an issue that was foreclosed as a matter of law (even now, he does not point to any specifics in the PSR that were inaccurate), and Defendant received the shortest sentence for which he was eligible, there is no prejudice from counsel's alleged failure.

The Court will address the final issue in this claim–counsel's failure "to follow through with the assistance the Petitioner sought to provide to the United States"–in a subsequent section of this R&R.

2.      Misinforming Defendant "as to the substance of the law."

In this ground for relief, Defendant maintains that counsel misinformed him as to the minimum term of years he would be required to serve before, during, and after counsel advised Defendant to plead guilty.  Assuming arguendo that is true, it too garners Defendant no relief. The law is well established that a "guilty plea means something.  It is not an invitation to a continuing litigation dialogue between a criminal defendant and the court."  *Murray v. United States*, 145 F.3d 1249,  1254 (11th Cir. 1998).  In fact,

the representations of the defendant, his lawyer, and the prosecutor at...a [plea]

> hearing, as well as any findings made by the judge accepting the plea, constitute a
> formidable barrier in any subsequent collateral proceedings.  Solemn declarations
> in open court carry a strong presumption of verity. The subsequent presentation of
> conclusory allegations unsupported by specifics is subject to summary dismissal,
> as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*,  431 U.S. 63, 73-74 (1977).  From the Court's meticulous recitation from

the change of plea proceeding, it is plain to see that the Court properly and fully advised

Defendant that he was facing a mandatory minimum sentence of ten years imprisonment and that

the only way he could receive less time was if the Government filed a substantial assistance

motion.  The Court made it clear to Defendant that he had signed a "straight up" plea agreement

without any contractual obligation on the part of the Government even to consider allowing

Defendant an opportunity to cooperate, and Defendant never indicated that he was being advised

to the contrary.  The Court offered him the opportunity to reveal any promises or representations

that had been made to him regarding the length of his sentence, and he, his counsel, and counsel

for the Government assured the Court that the Plea Agreement embodied the full understanding

of both parties.  Counsel's attempts to garner Defendant a shorter sentence at sentencing is not

indicative of deficient but rather zealous advocacy.  In short, Defendant's protestations that he

was misinformed regarding the length of his sentence are "contentions that in the face of the

record are wholly incredible."  *Blackledge*,  431 U.S. at 74.

  3.  Conflict of interest.

  Other than vague assertions that counsel "informed his other clients that [Defendant] was

looking to inform on them," Doc. 54 at 18, that counsel "and his other clients and friends then

began a campaign of telling [him] that [he] could not tell the Government what [he] knew," Doc.

57 at 4-5, that his "partner in distribution called [Defendant's] father...and said [Defendant] had

better keep [his] mouth shut," Doc 76 at 2, and that his counsel  "was tainted by [his] desire to

protect other drug clients," Doc. 54 at 18, Defendant has offered no specifics about any of these

alleged conversations.  He has, in his subsequent sworn statement, identified Danny Crutchfield,

Defendant's alleged marijuana distributer, and Steve Marsh as persons who recommended

counsel to him and who counsel "represented...at one time or another."  Doc. 78, Attach. 2.

Defendant "feel[s]" that his counsel "was still representing them while he was being paid to

defend [him]."  *Id*.

Although Defendant's sworn statement puts an identity on Mr. Bajoczky's former clients,

there remains insufficient evidence that counsel had any interest which conflicted with his

representation of Defendant in this matter.  Defendant's subjective belief that counsel acted

contrary to his best interests because he represented persons in the past with whom Defendant

was familiar and who Defendant was prepared to implicate in his marijuana growing operation

does not establish that counsel had an actual or potential conflict of interest.  Defendant

acknowledged that he retained Bajoczky knowing of these prior representations, as was his

constitutional right–indeed, counsel had previously also represented instant Defendant "on

several criminal cases in State Court," Doc. 73–and he has presented nothing to show that the

subject matter of the representation of these other persons was "substantially related" to

counsel's representation of Defendant in this matter or that counsel "ha[d] divided loyalties that

prevent[ed] him from effectively representing the defendant."  *United States v. Ross*, 33 F.3d

1507, 1522-23 (11th Cir. 1994), *cert. denied*, 515 U.S. 1132 (1995).

4.      Failing to assist cooperation efforts.

In his final claim for relief, Defendant maintains that his counsel was ineffective for

failing to assist or otherwise impeding Defendant in his attempts to cooperate with the

Government.  More specifically, Defendant claims that he created maps showing the location of

certain marijuana plots which his father delivered to counsel and which counsel did not timely

turn over to DEA.  Because the Court could not determine conclusively this one allegation of

ineffectiveness from the record as it stood, it allowed "the parties one additional opportunity to

submit affidavits; law enforcement memoranda, field notes, or reports; or any other documents

opposing or supporting this claim."  In response, Defendant submitted his father's affidavit and

his own sworn statement; the Government did not respond to the Court's order.  Nevertheless,

after Defendant's clarification of this claim, the Court is convinced that an evidentiary hearing is

not necessary.

According to Defendant's sworn statement, after he pled guilty, he asked his attorney "if

the Government would be interested in the remaining 146 marijuana plots [he] had left in the

woods."  Doc. 78, Attach. 2.  Defendant "knew from [his] discovery package that the D.E.A. had

the coded maps in their possession," and counsel advised Defendant that "yes they were

interested in the plants and all the other information [he] had as well."  *Id*.  Accordingly, counsel

"asked [him] to draw up a separate set of un-coded maps and he would give them to the D.E.A."

*Id*.  Defendant then spent three days with his father drawing "un-coded maps to all 32 locations

and 165 plots."  *Id*.  When he finished, his father "rushed them immediately to [counsel's]

office."  *Id*.

At some point thereafter, Defendant was interviewed by DEA and FDLE about "dirty law

enforcement," his personal crack dealer, his marijuana distribution partner, and "several more

small time dealers."  *Id*.  At that time, he also told DEA that he "had drawn detailed maps

and...had given them to [counsel]." *Id*. The agent "said they had tried to decode the originals and could not." *Id*. Defendant "tried to explain [his] decoding process to them" and told him that counsel "would be giving them the maps." *Id*.

On or about October 30, 2001, "D.E.A. came to see [Defendant]...and [he] asked them what did they find at the locations on the maps." *Id*. According to Defendant, "They looked at [him] confused and said 'what maps.'" *Id*. Defendant then "explained about the detailed maps [he] had drawn for [counsel]." *Id*. DEA "immediately left" and "went to [counsel's] office and picked up the maps." *Id*. Eight days later, Defendant received a letter telling him that he "was being denied a 5K1" because his "information was vague and of little use." *Id*. According to Defendant, he "was told all the plants had been harvested." *Id*.

According to the affidavit of Defendant's father, Brady Brown, he delivered the maps to Mr. Bajoczky in early September, 2001. Doc. 78, Attach. 1. When neither he nor his son heard from counsel, DEA, or FDLE, he "went to see Mr. Bajoczky to see had he heard from them." *Id*. According to Mr. Brown, counsel stated "he had not given the maps to them yet, but his plan was to give them a few maps at a time, to keep them interested in the information." *Id*.

Though counsel did not address the maps in his affidavit, with regard to Defendant's cooperation, he states:

> Early in the federal prosecution of [Defendant's] case, the Assistant U.S. Attorney
> informed me that because of Mr. Brown's past extensive criminal history...Mr.
> Brown would be required to provide greater assistance to the government than
> ordinary defendants in order for his cooperation to be considered "substantial
> assistance."  The Prosecutor further made it quite clear that any assistance
> provided by Mr. Brown regarding other persons involved in the
> cultivation/manufacturing of marijuana would **not** be considered or qualify as
> "substantial assistance" for a reduction in sentence.

*Id.* (emphasis in original).  He also maintains that he "encouraged Mr. Brown to give full and truthful information about all persons he knew that were involved in criminal activity" and that he "did **not** tell or suggest to Mr. Brown that he should withhold information about any person(s), but to the contrary specifically instructed/advised Mr. Brown to fully cooperate and be truthful with the Government."  *Id.* (emphasis in original).

According to the Government, Defendant "had only limited opportunities to obtain a substantial assistance motion" because of his "lengthy history of drug felony convictions and the fact that he had never served more than a few months in a county jail...."  Doc. 61 at 5.  This was communicated to counsel for Defendant: "[T]he undersigned [Michael T. Simpson] told defendant's counsel that a substantial assistance motion would not be filed unless defendant produced extra-ordinary results and that there would be no such motion if all he did was cooperate against other marijuana growers."  *Id.*  According to Mr. Simpson, he told counsel that he "questioned whether defendant knew 'anybody that needed to be in jail more than he does.'"  *Id.*

The Government agrees that Defendant did provide information to the Government: "information about other marijuana growers, information about marijuana suppliers he used when he had no home grown marijuana, information about the crack cocaine dealers he bought from, and information about law enforcement corruption."  *Id.*  Because of Defendant's criminal record and his lack of jail time, "the government was not particularly interested in the marijuana cultivation information," and "[i]ndeed, defendant provided more information about his own marijuana growing than that of anyone else."  *Id.* at 5-6.  The information regarding other marijuana distributors "was uncorroborated and could not readily be corroborated."  *Id.* at 6.

The crack dealers "were at a level which would not be prosecuted in federal court." *Id*.

Although the Government was particularly interested in Defendant's claim that he had

information regarding law enforcement corruption. *Id*.  According to the Government, however,

when Defendant was interviewed, "it developed that [he] had no first hand knowledge and only

believed that such corruption existed because of the open manner in which some dealers

operated." *Id*.

In his supplemental sworn statement, Defendant avers that he also told DEA and FDLE

about an "incident [he] had with former Liberty Co. Sheriff J.L. Bailey in 1997, while he was

still in office.  How [he] was held in county jail on no charge and Bailey offered [him] a deal.

Bailey said not to grow marijuana in 'his' county and we could work out a deal on the marijuana

[Defendant] sold." Doc. 78, Attach. 2.

Though Defendant did not garner any return on his attempted cooperation with law

enforcement, it is infinitely clear that nothing his attorney did or did not do seriously impeded

those efforts.  He met with DEA and FDLE on more than one occasion and, as the Government

acknowledges, he provided them with various kinds of information.  However, it is now clear

that the marijuana plot maps upon which the Court originally focused did not disclose

information on other marijuana growers but instead decoded maps which the Government

already had in its possession and were merely directions to additional plots of marijuana that

Defendant himself had planted.  Certainly, the agents were interested in such information from

the aspect of their desire to seize and destroy illegal drugs and perhaps to increase the scope of

the Government's case against Defendant, but the Court cannot fathom how this information

would otherwise have been beneficial to Defendant in light of the Government's undisputed

statement that it "was not particularly interested in the marijuana cultivation information."  This additional information on his own growing operations would only have increased the number of plants for which he was responsible for growing.  Defendant received the maximum number of acceptance of responsible points allowed under the Guidelines, and  because of his criminal history, he faced a minimum ten-year sentence regardless of the number of plants attributed to him.  *See* Supplemental Addendum to PSR at 18.

It cannot be disputed that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."  *Santobello v. New York*, 404 U.S. 257, 262 (1971).  However, Defendant's plea in the instant case specifically did not encompass any kind of cooperation agreement, and at the plea hearing, the Court thoroughly explained to Defendant that even if he did cooperate of his own volition, all discretion with regard to the filing of a substantial assistance motion lay with the Government.  *See supra* at 12-13.  Absent a substantial showing that the Government has improperly exercised its prosecutorial discretion for a reason which is either unconstitutional or not rationally related to a legitimate governmental end, the Court cannot question that discretion.  *Wade v. United States*, 504 U.S. 181, 185-186 (1992); *United States v. Forney*, 9 F.3d 1492, 1502-03 (11th Cir. 1993).  The Government was fully aware of the information which Defendant had regarding various matters, and its determination that none of this information reached the level of "substantial assistance"--a determination which was based on Defendant's lengthy criminal record and history of drug abuse and his ready impeachability as a witness--is not questionable by this Court since these are legitimate, rational reasons for not pursuing a defendant's cooperation proffer.  Neither counsel's actions nor his alleged inactions

prevented Defendant from cooperating and certainly did not prejudice him within the meaning of *Strickland* since nothing he did or did not do affected the Government's decision not to file a substantial assistance motion.

III.    Motion to supplement.

In his motion to supplement, Defendant seeks to raise a *Blakely/Booker* claim.  Following its decision in *Blakely v. Washington*, which involved the constitutionality of state sentencing guidelines, the United States Supreme Court determined that *Blakely* applies to the Federal Sentencing Guidelines as well.  *United States v. Booker*, ____ U.S. ____, 124 S.Ct. 2519, 159 L.Ed. 2d 442 (2004).  However, the Eleventh Circuit has determined that *Booker* is not retroactively applicable to cases on collateral review, as "*Booker*'s constitutional rule falls squarely under the category of new rules of criminal procedure that do not apply retroactively to § 2255 cases on collateral review."  *Varela v. United States*, 400 F.3d 864, 868 (11th Cir. 2005).

## **CONCLUSION**

Having carefully considered the matter, the Court finds that Defendant's claim that his due process rights were violated is not well taken.  Furthermore, the Court finds that Defendant's claims of ineffective assistance of counsel also fail in all respects.  Finally, the motion to supplement should also be denied.

In light of the foregoing, it is respectfully **RECOMMENDED**:

That the motion to vacate, set aside, or correct sentence, Doc. 52, be **DENIED**;

That the motion to supplement, Doc. 68, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida,  **4**[th] day of April, 2006.

s/ A. KORNBLUM
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 10 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

*Case No: 4:01-cr-00033-SPM-AK*